The ISALY COMPANY, Plaintiff,

v.

KRAFT, INC., Defendant.

No. 82–517 Civ–T–10.

United States District Court,
M.D. Florida,
Tampa Division.

July 15, 1985.

Rodney Morgan, Shear, Newman & Hahn, P.A., Tampa, Fla., D. Rein, Robert M. Kunstadt, Michael C. Stuart, Pennie & Edmonds, New York City, for plaintiff.

Thomas T. Steele, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, Fla., Jerome Gilson, Susan C. Cramer and Gary M. Ronski, William, Brinks, Olds, Hoffer, Gilson & Lione, Ltd., Chicago, Ill., for defendant.

## ORDER

HODGES, Chief Judge.

This action came before the Court for a nonjury trial. In accordance with Rule 52(a), F.R.Civ.P., the following shall constitute the Court's Findings of Fact and Conclusions of Law:

The Plaintiff, Isaly Company, Inc. (Isaly) is a Delaware corporation with its principal place of business in Clearwater, Florida. The Defendant, Kraft, Inc. (Kraft) is a Delaware corporation with its principal place of business in Glenview, Illinois. The Court has jurisdiction pursuant to 28 U.S.C. § 1338 and 15 U.S.C. § 1121.

The parties are competitors in the manufacture and sale of five ounce, square, chocolate-covered ice cream bars, the KLONDIKE and the POLAR B'AR, respectively. The packaging for their products is the focal point of their dispute. Specifically, Isaly asserts: Count 1—that Kraft's packaging constitutes a false designation of origin in violation of 15 U.S.C. § 1125(a); Count 2—infringement of registered trademarks covering Isaly's label and package designs in violation of 15 U.S.C. § 1114(a); Count 3—common law unfair competition; Count 4—dilution of Isaly's trade dress rights in violation of Florida Statute Section 495.151 *et seq.;* and Count 5—statutory unfair competition in violation of Florida Statute Section 501.201, *et seq.*

Kraft denies all of Isaly's claims and asserts the affirmative defenses of laches, acquiescence, and fraudulent trademark registrations. Kraft also counterclaims for cancellation of Isaly's trademark registrations and for damages.[1]

## BACKGROUND OF THE DISPUTE

In 1928 the Isaly Company was a family owned dairy business operating in Eastern Ohio and Western Pennsylvania. It began manufacturing five ounce chocolate-covered ice cream bars and sold them under the name KLONDIKE in family owned "deli's." In 1972 Isaly was purchased by an investment group headed by Gaylord Lamond. Five years later that group sold its interest in Isaly to the Clabir Corporation. In October 1981 and in May 1982 Clabir sold the Isaly "deli's," but retained the Isaly Company, Inc., and its business of manufacturing and selling Klondike bars.

Prior to May 1978, the Klondike bar was sold in a tri-state area comprising Western Pennsylvania, Eastern Ohio and Northern West Virginia. The product was advertised in newspapers and in point-of-sale materials in stores, both of which featured a polar bear emblem found on the bar's wrapper. The Klondike bar was also advertised on television. The commercial featured a prospector and a polar bear in a supermarket.

In late 1978, Isaly began to investigate the possibility of expanding the market for the Klondike. It planned to introduce the bar through distributors into supermarkets and convenience stores in various expansion markets.

Kraft is an international manufacturer and distributor of food products. A division of Kraft, the Dairy Group, is responsible for Kraft's brandname dairy products which are marketed principally under the brandnames "Sealtest" and "Breyers." Through a predecessor in interest, Kraft adopted the Sealtest trademark in 1935. The mark is often featured on Kraft's ice cream products. Since 1970, Kraft and its Dairy Group, have distributed ice cream products made by other companies in addition to its own.

In September 1978, Teck Heck, Isaly's marketing consultant, met with Robert Zogby, Vice President of Sales and Marketing of the Kraft Dairy Group, concerning a distribution arrangement between the parties. They orally agreed that Kraft would become Isaly's exclusive distributor for the Klondike bar in Florida. Isaly would be responsible for advertising the Klondike, and Kraft would be responsible for retail chain sales authorizations, distribution and store coverage, including installation of point-of-sale materials.

In early 1979, Kraft began distributing the Klondike in Florida. The parties stipu-

---

**1.** At trial Isaly moved to amend its complaint to conform to the evidence to include a request for cancellation of Kraft's trademark for POLAR B'AR on grounds of abandonment. Kraft moved to amend its answer to include the affirmative defenses of unclean hands, and trademark and trade dress misuse. Upon due consideration, the motions to amend are now GRANTED and the pleadings of the parties are so amended.

Subsequent to the submission of the parties' proposed findings of fact and conclusions of law, the Plaintiff filed an objection to a photograph included in Kraft's proposed findings. The photo features the various versions of the Klondike bar and the Polar B'ar manufactured and sold by the parties at the time of trial. The photo merely recreates evidence already admitted at trial. Upon due consideration the objection is OVERRULED.

late that the introduction of the bar into the Florida market was very successful. In October of that year representatives of Isaly and Kraft met again and discussed Kraft's interest in purchasing Isaly or in having Isaly pack Klondike bars for Kraft under the Sealtest name. James Santerre, President of Isaly, testified that Isaly wanted Kraft to expand its distribution of the Klondike, but that Kraft was reluctant to do so without a proprietary interest in the product. Kraft's proposals to purchase Isaly, or have Isaly contract-pack the Klondike, were rejected by Isaly.

From 1978 to the present the Klondike bar has been wrapped in pebbled foil presenting a $3 \times 3$ inch silver panel featuring a white and blue polar bear standing on all fours before a sunburst design. KLONDIKE was written in large letters beneath the bear and "Isaly's" appeared in small script lettering to the right of the bear. Originally, the Klondike bar was available in two versions, plain and "krispy." On the wrapper of the plain version, the sunburst designs and the name KLONDIKE were white and white and blue, respectively. The "krispy" version featured a yellow sunburst and a yellow and blue "Klondike" and polar bear. Isaly subsequently added a chocolate version which features a brown and blue sunburst and KLONDIKE on the wrapper. The Klondike bars were sold in a silver tray which also featured a large numeral "6" and was overwrapped in transparent plastic.

The "plain" Klondike bar has been wrapped in pebbled foil featuring the colors silver and blue since the 1940's. Since at least 1956 the colors silver, white and blue, KLONDIKE, "Isaly's" and a polar bear have been featured on the wrapper. Beginning in 1963 the Klondike bar was available in a six pack arrangement, and between 1963 and 1978 some six packs were in overwrapped trays while other six packs were simply overwrapped in clear plastic without a tray. In 1978 Isaly modernized the bar's wrapper and tray. The colors, images and words on the wrapper remained the same; however, KLONDIKE was emphasized, "Isaly's was reduced in size, and the stance of the polar bear was altered. In addition, since that time, all six packs have been sold in overwrapped trays.

In late 1979, the same year Kraft began distributing KLONDIKES in Florida, Kraft began to develop its own five ounce, chocolate-covered ice cream bar. At the time there were three other ice cream bars available in the market in addition to the Klondike bar: the Eskimo Pie Penguin Bar, the Yukon Bar and the Gold Rush Bar.

Kraft's new bar was to be named POLAR B'AR. Don Herr, the Dairy Group's new product development manager, testified that he found the name on a list of unused Kraft trademarks. POLAR B'AR had been the name of an ice cream bar sold by a predecessor of Kraft, Southern Dairies, Inc. (Southern), from 1929 to 1932. The rectangular bar made by Southern was wrapped in pebbled silver foil, featured "Polar B'ar" in gold lettering, and bore the image of a white polar bear in an artic setting. The trademark registration was periodically renewed and, through merger, became owned by Kraft. Southern also obtained a federal trademark registration for the polar bear representation on the wrapper, No. 257,988. However, that registration expired in 1969.

In February 1980, Kraft hired Thomas J. Paul, Inc., a design firm, to design packaging for the new Polar B'ar ice cream product. The Paul firm stated in a memo to Kraft that the proposed ice cream bar would be "overwrapped with foil in the manner of the Isaly's Klondike product, complete samples of which have been supplied to us. Client will also pack his product six packages to a board tray with a celophane overwrap as per the Isaly's sample." (Plaintiff's Trial Exhibit 98A).[2]

In July-August, 1980 Kraft introduced its Sealtest Polar B'ar into the market. Kraft

---

**2.** Ultimately, the Polar B'ar wrapper approved by Kraft was designed by another graphic design firm, Ford-Byrne.

was still the exclusive distributor of Isaly's Klondike bar in Florida. At the time of its introduction the Polar B'ar was wrapped in pebbled foil and presented a $3 \times 3$ inch silver panel with a white polar bear standing on all fours contained within a triangular color panel in the bottom corner of the bar. POLAR B'AR was written in large block letters diagonally across the center of the bar. POLAR B'AR was written in large block letters diagonally across the center of the bar. "Sealtest," in script, appeared in a red box in the upper left corner, and the phrase "made with real milk chocolate" was contained in a red circle at the bottom left corner of the bar.

In 1980 Polar B'ars were sold in two forms: plain and "crunchy." The colors of the triangle containing the bear and POLAR B'AR varied with each version. On the plain version, the triangle and POLAR B'AR were royal blue. On the "crunchy" they were red. At the time of trial Kraft sold four versions of the bar. In addition to plain and "crunchy," Polar Ba'r was available in chocolate and mint flavors. On those versions the triangle and the brandname were colored in brown and green, respectively.[3]

Polar B'ars were sold in a six pack tray overwrapped in clear plastic. The tray was silver and displayed a large numeral "6" between the brandname and the product description. Kraft promoted the bar by television and newspaper coupon advertising. Its television commercial featured the image of a bear, punctuated by the bear's roar while transitioning to the Polar B'ar wrapper.

Kraft was the exclusive distributor of the Klondike bar in Florida from 1979 until 1982. On February 24, 1982 Kraft notified Isaly in a letter of its intention to terminate its distribution of KLONDIKE as of April 23, 1982. On May 10, 1982 Isaly initiated this suit.

## TRADE DRESS INFRINGEMENT

As stated previously, Isaly's complaint is framed in multiple counts advancing several legal theories. However, the essence of the case is the claim for trade dress infringement. Trade dress infringement is an implied federal cause of action based upon that portion of the Lanham Act which provides:

> Any person who shall ... use in connection with any goods or services, or any container or containers for goods ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125. See *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir.1983). '[The Eleventh Circuit] and the former Fifth Circuit have held that § 43(a) creates a federal cause of action for trade dress infringement.' citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 830–32 (11th Cir.1982); *Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 192 (5th Cir. 1981).

The term "trade dress" refers to the total image of a product. It includes features such as size, texture, shape, color or color combinations, graphics or even particular sales techniques. *John H. Harland Co.*, *supra*, at 980 citing *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055 (3d Cir.1980). To prevail on a trade dress infringement claim, a plaintiff must establish the following elements: that its trade dress has a quality of inherent distinctiveness or has otherwise acquired a secondary meaning in the market place; that the relevant features of its trade dress are not merely or wholly functional; and that the defendant's product has trade dress which is confusingly similar to the plaintiff's trade dress. *Brooks*

---

**3.** In 1985 Kraft introduced two new versions of Polar B'ar, heavenly hash and peanut butter crunch. The triangle and the POLAR B'AR are light blue and golden brown, respectively.

*Shoe Mfg. Co., v. Suave Shoe Corp.,* 716 F.2d 854, 857 (11th Cir.1983).

## INHERENT DISTINCTIVENESS

In *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695 (5th Cir. Unit A 1981) the Fifth Circuit determined that a plaintiff in a trade dress infringement action need not prove secondary meaning when its trade dress is inherently distinctive. Although *Chevron Chemical* is not binding precedent in this Circuit, the Eleventh Circuit has cited it with approval in five recent decisions. *See University of Ga. Athletic Ass'n. v. Laite,* 756 F.2d 1535 (11th Cir.1985); *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1513 n. 5 (11th Cir.1984); *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854, 857 n. 9 (11th Cir.1983); *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 981 n. 5 (11th Cir.1983); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 831 N. 14 (11th Cir.1982).

■ Distinctiveness has been defined as a term used to indicate that a mark or dress serves as a symbol of origin and thus is protectable. *Sicilia DI R. Biebow & Co. v. Cox,* 732 F.2d 417 (5th Cir.1984).

Fanciful and arbitrary marks are considered inherently distinctive. 'A fanciful mark is a word which is coined for the express purpose of functioning as a trademark .... An arbitrary mark consists of a word or symbol which is in common usage ..., but which is arbitrarily applied to the goods ....' The same principles apply in the context of trade dress, although selection is from designs and configurations, not words. Thus, a trade dress feature is distinctive if it is arbitrary or fanciful, and not descriptive or functional. Functional features cannot be protected, and merely descriptive features must have acquired secondary meaning before qualifying for protection. *Id* at 425 (citations omitted).

In determining whether the Plaintiff's trade dress is inherently distinctive the Court must consider the following factors:

1) whether it [is] a 'common' basic shape or design, 2) whether it [is] unique or unusual in a particular field, [and] 3) whether it [is] a mere refinement of a commonly-adapted and well known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods. *Brooks, supra,* at 857–58 citing *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.,* 568 F.2d 1342 (C.C.P.A.1977).

Isaly's Klondike bar trade dress may be broken down into two elements: (1) the wrapper containing the ice cream bar, including the graphics on the wrapper; and (2) the overwrapped tray into which the wrapped bars are placed. Neither the tray nor the wrapper alone (exclusive of the graphics) are inherently distinctive. Each is a mere refinement of storage and display packaging commonly associated with ice cream products. The overwrapped tray is different from the often used closed carton, but is not unique. Similarly, the Klondike bar wrapper is merely a variation of foil wrapping which is commonly used to contain ice cream products.

■ However, there are features of the wrapper which are arbitrary and serve no function either to describe the product or assist in its effective packaging. *Chevron, supra,* at 702. The Klondike bar wrapper is a complex composite of size, color, texture and graphics which must be considered together or as a whole, not separately, in determining distinctiveness. The combination of the bar's size, the silver, blue and white wrapper, the pebbled texture of the foil, the polar bear and sunburst images and their arrangement on the wrapper, and the style of the printing, all create a distinctive visual impression. See *Brooks, supra,* at 858 citing *Chevron, supra,* at 703. This overall visual impression has remained consistent over the years despite moderizations of the wrapper.

The Plaintiff especially urges that Isaly's polar bear logo itself renders the wrapper inherently distinctive. To refute this assertion the Defendant introduced third party ice cream packages which depict a variety

of polar bears. However, all of those packages and wrappers differ from the Klondike bar wrapper with respect to size, substance, type of ice cream product, color and words. Third party users that incorporate isolated features of the Klondike bar wrapper, together with additional distinctive characteristics of their own, do not render Isaly's trade dress indistinct. The distinctive nature of the Klondike wrapper is based on the overall effect of its combination of features; but the polar bear is clearly the dominant, visual component of the KLONDIKE wrapper, and is distinct.

As a further rebuttal of Isaly's assertion of distinctiveness, Kraft introduced into evidence a variety of foil ice cream wrappers featuring the colors silver, white and blue, and artic motifs. However, the existence of other piece-meal combinations of size, texture, colors, images and printing on ice cream bar wrappers merely supports the conclusion that the unique arrangement of the various elements featured on the Klondike wrapper are arbitrary and therefore distinctive.

In sum, viewing the wrappers containing the different versions of the Klondike bar, the Court finds that the collocation of features on the "plain" wrapper renders it the most distinctive of the Klondike wrappers. This determination does not diminish the distinctive nature of the wrappers on the remaining versions, but simply serves to focus on that combination of features which has been in use by Isaly since 1959.

The Court's determination that the Klondike bar wrapper is inherently distinct eliminates the necessity that Isaly demonstrate secondary meaning. *Chevron, supra.* Nevertheless, the evidence shows that the wrapper has acquired a secondary meaning, and had done so prior to the introduction of Kraft's Polar B'ar.

## SECONDARY MEANING

■ The purpose of trade dress is to enable and to encourage consumers to distinguish between similar goods or services supplied from different sources. Through extensive use by a single supplier, a trade dress becomes recognized by the public as an identification of the source of the product. A secondary meaning is acquired when consumer identification of the trade dress and its source is achieved. Secondary meaning can be proved by either direct or circumstantial evidence. The Court should consider the following factors in determining whether a trade dress has acquired secondary meaning:

(1) the length of time and manner of its use, (2) the nature and extent of its use and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the mark and a particular source of origin. *Brooks Shoe Mfg. Co., Inc. v. Suave Shoe Corp.,* 533 F.Supp. 75, 78 citing *Volkswagenwerk-Aktiengesellschaft v. Rickard,* 492 F.2d 474, 478 (5th Cir.1974); 3 Callman, Unfair Competition, Trademars and Monopolies § 77.3 at 349 (3d ed. 1969).

The Klondike bar has been sold in areas of Pennsylvania and Ohio since 1931. The Plaintiff introduced into evidence a brochure printed by Isaly to commemorate its 25th Anniversary (Plaintiff's Trial Exhibit # 12). The brochure lists all of Isaly's retail outlets as of 1956, the majority of which were concentrated in Pennsylvania. The brochure also features the Klondike bar. The texture, size, colors, images and printing on the 1956 Klondike bar have remained virtually the same to the present day.

Advertisement of the bars prior to 1980 usually featured the wrapper and emphasized the connection between the product and the polar bear. The scope, nature and duration of advertising are factors that aid the court in determining whether a trade dress has received secondary meaning. The ultimate question in considering evidence of promotion, however is not merely the extent of the promotional efforts, but their effectiveness in creating an association between the trade dress and Isaly. *Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 850 (5th Cir.1970). The effectiveness of Isaly's advertising is substantiated by evidence of consumer recog-

nition of the product. Isaly introduced as evidence letters it had received from consumers after the introduction of the Polar B'ar in its new expansion markets. Many of the letters are from former residents of Pittsburgh who recalled eating the Klondike bar in their childhood.

In the Isaly fiscal year ending January 31, 1980, over half a million cases of Klondike bar were sold in Pennsylvania, New Jersey, Florida, Ohio and the Baltimore-D.C. markets. Sales reached nearly five million in that year and an average of 169 cases of the product were sold per thousand households in Western Pennsylvania. By comparison, during that same year in Florida, Isaly achieved a sales level of 42 cases per thousand households.

The letters from consumers and the sales figures establish that the Klondike bar was extremely popular, particularly in Pennsylvania, and had become something of an institution in Pittsburgh. The Plaintiff introduced a book of Pittsburgh expressions which defines Klondike as "a popular ice cream treat, known to have been airlifted to distant parts of the United States by dislocated Pittsburghers hooked on its unique taste." (Plaintiff's Trial Exhibit # 74).

The long time use of the various features on the Klondike bar wrapper together with the evidence of sales, advertising and consumer recognition raises the inference that the public identifies Isaly's Klondike bar with Isaly. In particular, the evidence clearly points to the acquisition of secondary meaning by the Klondike wrapper in the Western Pennsylvania market well before the introduction of Kraft's Polar B'ar in 1980.

## FUNCTIONALITY

Trade dress is protectable under the Lanham Act if, taken as a whole, it is primarily nonfunctional. The fact that individual elements of packaging are functional does not render the package as a whole incapable of protection. See e.g. *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204 (2d

Cir.1979) cited with approval in *John H. Harland, Co., supra* at 982–88 n. 27. "The line between functionality and non-functionality is not brightly drawn in every case." *Truck Equipment Service Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1218 (8th Cir.1975). In determining whether trade dress is primarily non-functional, the test is whether upholding an exclusive right to use the trade dress as a whole would hinder effective competition by others. Factors to be taken into account are whether a particular design is superior, whether there are alternative trade dress configurations available, and whether a particular design is comparatively simple or cheap. *In re Morton-Norwich Products, Inc.*, 671 F.2d 1332, 1339–41 (C.C.P.A.1982); *In re World's Finest Chocolate, Inc.*, 474 F.2d 1012, 1014 (C.C.P.A.1973).

Some of the features of the Klondike bar's packaging are functional. The open six bar tray offers stability to the product while it is in transit, in storage or on display. The tray is clearly superior protection to merely wrapping six bars in plastic. However, it offers less stability and protection than a closed carton. The tray also provides space to promote and describe the product as well as a location for coupons. The clear plastic overwrap provides only slight stability and protection, but permits the consumer to view the product—a significant disadvantage of a closed carton. The foil wrapper protects the ice cream bar and also provides a means of holding the ice cream while it is eaten. The fold technique, a deadfold wrap, is less secure than a heat sealed wrapper, but serves to adequately contain the product and is easy to open or reseal. In addition, there was evidence that the deadfold wrap is cheaper than a heat sealed wrapper, and that the foil of the wrapper tends to denote coldness and quality.

Given those considerations, the tray and plastic overwrap elements of Isaly's trade dress are basically functional. As functional components they are not subject to protection under the Lanham Act.

However, despite its functional features, the Klondike foil wrapper, with its graphics, is primarily nonfunctional. The pebbled texture of the foil and the colors, images and lettering featured on the wrapper are all nonfunctional. The Plaintiff does not seek to claim any exclusive right to all dead fold foil wrappers, but merely claims it is entitled to protection of the combination of texture and graphics which comprise its foil wrapper. The evidence of a variety of other foil ice cream wrappers which are different from the Klondike wrapper serves to demonstrate that giving the Plaintiff an exclusive right to its form of wrapper would not hinder effective competition and that alternative trade dresses are available.

## LIKELIHOOD OF CONFUSION

"The touchstone under Section 43(a) is ... similarity in the overall trade dress of the products." *Sun-Fun Products, supra,* 656 F.2d at 192. To that end, the Court now inquires into the likelihood of confusion between the parties' trade dress.

In determining whether there is a likelihood of confusion the finder of fact evaluates a variety of factors: the type of trade dress, the similarity of design, the similarity of the product, the similarity of the advertising media used, the defendant's intent and actual confusion. *Exxon Corp v. Texas Motor Exchange,* 628 F.2d 500, 504 (5th Cir.1980); *Roto-Rooter Corp v. O'Neal,* 513 F.2d 44, 45 (5th Cir.1975).

The first factor to be considered is whether the Plaintiff's trade dress is strong or weak. Based upon the Court's determination that the Klondike bar wrapper is inherently distinctive and/or has acquired secondary meaning, the Plaintiff has a strong trade dress.

The similarity of design test has been described as nothing more than a subjective eyeball test. The similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks. *Exxon*

*Corp. v. Texas Motor Exchange, supra,* at 505 (citations omitted).

Examination of the parties' labels for the plain bar show that both are of identical size, made of textured or stippled aluminum foil, silver in color, printed primarily with blue and white inks. Both display on a 3 x 3 inch panel a side view of a white polar bear on all fours over the product name printed in large block letters, accompanied by the company name (Sealtest or Isaly's) in much smaller script lettering. Isaly's bear logo is depicted against a curved sunburst design, while Kraft's bear has a comparably curved back.

Upon visual inspection, the wrapped bars convey the same overall appearance. Each party produces versions of its bar which are differently colored and, therefore, less similar. Nevertheless, all versions of each party's ice cream bar are contained in wrappers which are the same size and shape, use block lettering and script and feature a silver background and a polar bear.

The third factor to be considered is the similarity of the products; and, in this instance the products are identical. They are both five ounce, stickless, chocolate covered ice cream bars. In 1980 when Kraft introduced its bar, both parties offered only plain or textured chocolate coating. Isaly introduced evidence that Kraft went to the same supplier of chocolate used by Isaly to achieve the same taste and quality in chocolate coating on the Polar B'ar. The products are also similar in price, retailing at approximately $2.50 per six pack; and both are put to the same use by the consumer, i.e. eaten as snacks or dessert.

The similarity of trade channels, purchasers, and means of advertising is the fourth factor to be considered.

Dissimilarities between the retail outlets for and the predominant consumer of plaintiff's and defendant's products lessen the possibility of confusion, mistake or deception. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 262 (5th Cir.1980).

Both products are sold in supermarkets and convenience stores in the freezer section. Both bars are primarily sold in six packs in the grocery stores and are sold individually in convenience stores. The competing products are often displayed side by side in the store freezer. Both bars are bought by the same class of purchasers and are advertised primarily on television and in the newspaper. With respect to television advertising, each party has featured a polar bear in its commercials. Kraft's television commercial, like Isaly's prospector commercial, used the device of a full-frame image of a bear punctuated by the bear's roar, transitioning to the package with its images of the bear. Kraft's newspaper advertisements, like Isaly's, featured coupons located at the bottom, with a prominent picture of a bar with a bite missing in the center of the advertisement.

An additional factor to consider is the Defendant's intent to deceive buyers.

> The Fifth Circuit has stated that '[i]f … a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone "may be sufficient to justify the inference that there is confusing similarity." ' *Exxon Corp. v. Texas Motor Exchange, supra* at 506; Restatement of Torts § 829 Comment f (1938); *Amstar Corp. v. Domino's Pizza, Inc., supra.*

As the exclusive distributor of the Klondike bar in Florida, Kraft was in a position to acquire unique knowledge of the Klondike bar and was well aware of the bar's public appeal. Evidence was introduced that Kraft's representatives and Polar B'ar label designers considered the Klondike bar to be the "gold standard" in terms of ingredients and packaging; and as previously noted, Kraft went to the same chocolate supplier used by Isaly to acquire the same quality and taste in the chocolate coating of the Polar B'ar.

The final factor for the Court to consider is the existence, or absence, of actual confusion. However, positive evidence of actual confusion, although persuasive is not necessary to a finding of a likelihood of confusion. The Plaintiff presented four consumers who asserted they had been confused while making purchases in the market place. Each of the witnesses had notified Isaly of his or her confusion by letter or telephone. The Plaintiff also presented evidence of a survey conducted by Dr. Marguerite L. Rittenhouse.

Dr. Rittenhouse conducted one in-store test at a New Jersey supermarket. Consumers entering the store were given a coupon by an associate of Rittenhouse. The black and white coupon featured a picture of the Klondike six pack and the phrase "Save $1.50 when you purchase a 6-pack Klondike Vanilla Ice Cream Chocolate Covered." Rittenhouse stationed herself near the freezer where both Klondike and Polar B'ars were displayed. The test was based upon 109 "unguided" purchases. If a consumer appeared confused Rittenhouse would approach and inquire whether the person intended to redeem the Klondike coupon. Rittenhouse concluded that 13.8% of the shoppers were actually confused by the Polar B'ar; 1.8% appeared confused, but the confusion could not be confirmed; 5.5% were confused, but a purchase was not immediately intended; and 9.2% were potentially confused. In total, Rittenhouse determined that between 13.8% and 30.3% of the shoppers she observed evidenced some degree of confusion.[4]

Kraft introduced a survey by Dr. Robert C. Sorenson to controvert Rittenhouse's test. Sorenson organized a consumer survey which took place in the consumer's home. The survey was conducted in Tampa, Philadelphia and Cleveland of persons 21 years of age or older who had previously purchased or consumed ice cream in the preceding 12 months. 685 interviews were completed. Sorenson concluded that 56.6%

---

**4.** Due to procedural and methodological errors the integrity of the Rittenhouse survey is questionable. Nevertheless, the weaknesses of the survey go to its weight rather than its admissibility. Accordingly, the Defendant's motion to strike the testimony and survey of Dr. Rittenhouse is DENIED.

of those surveyed, when asked the name of the company making the Polar B'ar, identified Sealtest and/or Kraft. 66.7% of previous purchasers of Klondike surveyed identified Sealtest as the maker of Polar B'ar. No one stated that they believed that Klondike and Polar B'ar were made by the same company. Nevertheless, the survey did reveal some degree of actual confusion. Sorenson concluded that 1.6% of all purchasers are confused as to the source of the Polar B'ar.

The integrity of the Sorenson survey is also reduced by various procedural and methodological errors. Significantly, the respondents were never shown the Klondike bar while Kraft's Polar B'ar was displayed before the consumer thereby permitting the interviewee to read the label.

In light of the weaknesses affecting each of the surveys, the Court gives neither any controlling weight on the issue of actual confusion.

■ In summary, the Court has found that Isaly's trade dress is relatively strong; that the labels of Isaly and Kraft are similar in design; that both parties offer identical products in the same retail outlets to the same purchasers for the same use; that they both advertise on television and in newspapers; that Kraft intended to emulate if not infringe; and that there is some indication of actual confusion. Weighing these factors together, the Court concludes that they establish a likelihood of confusion.

■ The Plaintiff has therefore established the requisite elements to support its claim of trade dress infringement. The Klondike's pebbled foil wrapper featuring a combination of colors, images and lettering is inherently distinctive and has acquired secondary meaning. The features of the wrapper taken as a whole are primarily nonfunctional, and Kraft's Polar B'ar wrapper is confusingly similar. Absent any justification for the Defendant's infringement of Isaly's trade dress by way of some affirmative defense, Isaly's Klondike bar wrapper is entitled to protection under the Lanham Act.

## TRADEMARK INFRINGEMENT

Count II of Isaly's complaint asserts the claim of trademark infringement pursuant to Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(a). A defendant is liable for infringement if, without the consent of the registrant, it uses "in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark (which) is likely to cause confusion or to cause mistake, or to deceive." *Id.*

■ To recover under Section 32(a), Isaly must have a validly registered trademark. However, the critical question is whether there is a likelihood of confusion, mistake, or deception between Isaly's registered marks and the allegedly infringing design or mark of Kraft. *John H. Harland Co., supra,* 711 F.2d at 972. Isaly claims infringement of its federal registrations for "Isaly's Klondike" and the design appearing on the individual wrappers (Registration No. 1,203,776) and "Klondikes" and the design appearing on the sides of its six pack trays (Registration No. 1,169,497).

On September 15, 1981 Registration No. 1,169,497 was issued to Isaly based upon a date of first use in 1963, for a trademark consisting of a package design featuring the colors silver, blue and white as applied to a "chocolate covered ice cream slice." On August 3, 1983 Registration No. 1,203,776 was issued to Isaly based upon a date of first use in 1959, for a trademark consisting of a label design featuring the colors silver, blue and white as applied to a "chocolate covered ice cream slice."

During the pendency of this case, on October 28, 1982, Kraft applied for federal trademark registration of its wrapper design, consisting of the previously registered SEALTEST logo, the previously registered POLAR B'AR trademark, and the design representation of a polar bear.

The application, Serial No. 401,019, POLAR B'AR and label design was accepted

for publication by the Patent and Trademark Office.

 Isaly has a proprietary interest in two registered trademarks. Assuming that the marks are validly registered, then, for the reasons previously stated in support of the Court's determination that there is a likelihood of confusion between the foil wrappers of the parties, the Court now concludes that the design of the Polar B'ar wrapper, presently a registered trademark, is confusingly similar to the Klondike bar designs registered to Isaly. The factors relevant to determining whether there is a likelihood of confusion between the trade dress of two products are essentially the same as those relevant to determining whether there is a likelihood of confusion between the parties' trademarks. *John H. Harland Co., supra*, at 981. In the absence of affirmative defenses to justify the Defendant's infringement, the Plaintiff is also entitled to prevail on its claim for trademark infringement.

## AFFIRMATIVE DEFENSES

Kraft has asserted the affirmative defenses of laches, acquiescence, fraudulent obtainment of trademark registrations, unclean hands and trademark and trade dress misuse.

### A. Laches

 Kraft contends that Isaly should be denied any relief because of laches. To establish laches the Defendant must demonstrate a delay in asserting a right or claim; that the delay was not excusable; and that the delay caused the Defendant undue prejudice. *Environmental Defense Fund v. Alexander*, 614 F.2d 474 (5th Cir.1980). However, the test for determining laches is flexible, and the doctrine is applied in two classes of cases: one in which the plaintiff's delay has been so outrageous, unreasonable, or unexcusable as to constitute virtual abandonment; and a second more common class of cases in which the delay is not so unreasonable and the defendant must show the type of prejudice leading to estoppel. *Conagra*, 743 F.2d at 1517 n. 15, *supra*, citing *Univ. of*

*Pittsburg v. Champion Products, Inc.*, 686 F.2d 1040, 1044–45 (3d Cir.1982).

An additional factor the Court must consider is the public interest in the Plaintiff's trade dress or mark as a definite designation of a single source. Thus, even though a defendant may suffer some prejudice, the public interest in avoiding confusion may outweigh the prejudice. *Conagra, supra*, at 1517, citing *James Burroughs, Ltd., v. Sign of The Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir.1978).

 The Plaintiff became aware of the Defendant's infringing trade dress in 1980 when the Polar B'ar was introduced. In May 1982, less than two years later, the Plaintiff filed this action. It is noteworthy that the parties maintained their distribution arrangement until April 1982. For reasons of economy, satisfaction with Kraft's distribution and good will the Plaintiff delayed filing suit. Permitting less than two years to go by before filing suit is not an unreasonable delay; and based upon legitimate reasons any delay that did occur is excusable.

The Defendant asserts it was prejudiced by Isaly's delay. Kraft states that it expended millions of dollars in advertising promotion and plant equipment. However, such an expenditure is comensurate with that of any major manufacturer introducing a new product; and, there is no proof that the Defendant made the expenditure in reliance on the Plaintiff's reluctance to sue nor has Kraft established that it would not have made the same expenditures if it had been sued immediately. Finally, in light of the Courts determination concerning likelihood of public confusion, any prejudice suffered by the Defendant is outweighed by public interest in avoiding confusion.

### B. Acquiescence

 Acquiescence has been described as analogous to an implied license to use a trade dress or mark terminable at the will of the licensor. *Conagra, supra*, at 1516. There is simply no evidence to support Kraft's assertion that Isaly's knowledge

and silence amounted to a consent for Kraft to use the Klondike bar trade dress or trademark. Furthermore, assuming such consent, any implied right was terminated upon the filing of this action.

### C. Fraud and Unclean Hands

In support of its affirmative defenses of fraudulent obtainment of trademark registrations and unclean hands, the Defendant asserts that in obtaining its trademark registrations, 1,169,497 and 1,203,776, Isaly misrepresented the dates of first use. The first use dates are 1963 and 1959, respectively. Kraft asserts that the correct date of first use for both registrations is May 1978.

 To establish fraud, Kraft must prove that Isaly made a false, material statement of fact which would have constituted grounds for denial of the registrations had the truth been known. *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1544 (11th Cir.1984). In a deposition taken by the Defendant, H. William Isaly, Isaly's Vice President, stated that the registered design on the wrapper (1,203,776) had been first used in the precise manner featured on the registration form in 1978. Isaly explains that Mr. Isaly's earlier selection of 1959 as the first date on the registration form for the Klondike wrapper reflected his interpretation of the term "first use" as referring to the date Isaly first began to use, as individual elements, the polar bear, the sunburst, KLONDIKE in block letters, and "Isaly" in script; and it is clear that those symbols have been featured on the Klondike bar wrapper since 1959 and on the six pack tray since 1963. Moreover, even assuming the dates given were incorrect, Kraft has failed to demonstrate that this would constitute grounds for denial of the registrations. The Defendant's defenses of unclean hands and fraud are without merit.

### D. Misuse of Trademark and Trade Dress

 Kraft bases its assertion of misuse on the premise that Isaly initiated this action to suppress competition by the Defendant. Specifically, Kraft contends that Isaly misused its trade dress and trademark in violation of the antitrust laws by attempting to monopolize the five ounce ice cream bar market. The defense is without merit. Kraft has made no showing that Plaintiff filed the suit as an attempt to monopolize the relevant market.

In sum, Kraft's affirmative defenses are without merit. The Defendant's counterclaim for cancellation of Isaly's trademark registration based on fraud, unclean hands and misuse is DENIED.

### REMAINING CLAIMS

Remaining for consideration are Isaly's claims of unfair competition and dilution under Florida law. In addition, the Court must address Isaly's request for cancellation of Kraft's Polar B'ar trademark registration, 254,111, on grounds of abandonment.

As a general rule the same facts supporting an action for trademark and trade dress infringement would also support actions for unfair competition and dilution. The standards governing the state law claims are similar, if not identical, to those under the Lanham Act. *Conagra, supra.* Because of the similarity between Isaly's claims under the Act and its state common law and statutory claims (see *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160 (11th Cir.1982); *Amstar, supra* ); and because the Court has determined that Isaly is entitled to prevail on its Lanham Act claims, the Court need not address the state law claims separately.

 Finally, Isaly's request for cancellation of the Polar B'ar trademark is due to be denied. Strict proof is required to establish abandonment. *Citibank, supra,* at 1545. Isaly must demonstrate that Kraft actually abandoned the use of the mark and, also, intended to abandon the mark. Kraft concedes that the Polar B'ar mark was not used from 1932, when Southern discontinued its use, until 1980. Accordingly, non-use for two consecutive

years is prima facie abandonment. 15 U.S.C. § 1127. However, after assignment of the right to the mark, Kraft has continuously renewed the federal registration. Nonuse by Southern and later Kraft, may indicate actual abandonment but there is no evidence that Kraft intended to abandon the mark since the time it was acquired. Moreover, Kraft's continual renewal of the registration raises the inference that Kraft intended to eventually resume use of the mark.

## JUDGMENT

Upon due consideration it is ORDERED and ADJUDGED.

### A. Injunctive and Other Relief

1. Isaly's claim in Count I for trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is GRANTED with respect to Isaly's Klondike bar wrapper and label. In all other respects the claim is DENIED.

2. Isaly's claim in Count II for trademark infringement under Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(a), of Trademark Registrations Nos. 1,203,776 and 1,169,497 is GRANTED.

3. Kraft's counterclaim for cancellation of Isaly's Trademark Registrations Nos. 1,203,776 and 1,169,497 is DENIED.

4. Isaly's claim for cancellation of Kraft's Trademark Registration No. 254,-111 is DENIED.

5. Isaly is entitled to, and is hereby GRANTED, effective 180 days from the date of this judgment, an injunction enjoining Kraft, its agents, employees, attorneys, and all persons in active concert and participation with them, from the unauthorized use or employment in connection with the manufacturing, selling, distributing, offering for sale, advertising, promoting, displaying, soliciting and filling orders for or otherwise marketing a five ounce chocolate covered ice cream bar bearing a label, or contained in a tray bearing a label, which features a picture, drawing or other representation of a polar bear. 15 U.S.C. § 1116.

6. Isaly is entitled to, and is hereby GRANTED, effective 180 days from the date of this Order, an injunction enjoining Kraft, its agents, employees, attorneys, and all persons in active concert and participation with them, from the unauthorized use or employment in connection with the manufacturing, selling, distributing, offering for sale, advertising, promoting, displaying, soliciting and filling orders for or otherwise marketing a five ounce chocolate covered ice cream bar in pebbled foil wrappers bearing a label featuring the color royal blue. 15 U.S.C. § 1116.

7. Islay is entitled to the delivering-up to it for destruction of all infringing wrappers and trays. Kraft is directed to deliver-up to Isaly within 120 days all wrappers and trays in its possession or control bearing any infringing design label. 15 U.S.C. § 1118.

### B. Damages

 The Lanham Act provides for recovery by a successful plaintiff of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117. This recovery is cumulative, that is, the Court may award Isaly both its damages and defendant's profits. *Maltina Corp. v. Cawy Bottling Co., Inc.,* 613 F.2d 582 (5th Cir.1980); *CPC Intern. v. Albury Sales Co., Inc.,* 504 F.Supp. 549 (S.D.Fla.1980). There are, however, different standards for the awarding of each.

 Accounting for profits is an equitable remedy. The Plaintiff need not demonstrate any actual damages in order to obtain an accounting for profits. *Playboy Enterprises, Inc., v. P.K. Sorren Export Co.,* 546 F.Supp. 987 (S.D.Fla.1982) citing *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 161 n. 15 (1st Cir.1977).

 In order to recover damages (apart from Defendant's profits), a Plaintiff must show that it suffered actual damages. *Maltina Corp., supra.* The Plaintiff must prove lost sales and that the loss was caused by Defendant's actions. *Obear-*

*Nester Glass Co. v. United Drug Co.*, 149 F.2d 671, 674 (8th Cir.1945), cert. denied, 326 U.S. 761, 66 S.Ct. 141. The Court may award plaintiff up to three times the amount of profits made by the defendant, as justice shall require. 15 U.S.C. § 1117; *Deering Milliken & Co. v. Gilbert*, 269 F.2d 191 (2d Cir.1959). Such an award is discretionary and may be based on a finding of willfulness. *Boston Professional Hockey Ass'n. Inc. v. Dallas Cap and Emblem Mfg., Inc.*, 597 F.2d 71 (5th Cir.1979). It may not be punitive, however, and must be based on an actual showing of harm. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir.1978). *Caesar's World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 273 (3d Cir.1975).

The parties previously stipulated, with the approval of the Court (see Pretrial Order entered January 31, 1984, Doc. No. 152), that the trial would be bifurcated and the issue of Plaintiff's damages, if any, would be reserved for subsequent proceedings.

Accordingly, the Clerk is directed to reschedule the matter for trial as to all issues relating to Plaintiff's claim for damages, establishing a date for the completion of such additional discovery as the parties may wish to pursue, and a pre-trial conference.

IT IS SO ORDERED.