MONSANTO COMPANY and The
NutraSweet Company,
Plaintiffs,

v.

Fausto J. CAMPUZANO
et al., Defendants.

No. 99–2082–Civ.

United States District Court,
S.D. Florida,
Miami Division.

April 26, 2002.
Order Modifying Decision May 2, 2002.

---

Keith Mack, Miami, FL, for Monsanto Co.

Rodney A. Brown, Brown & Fox, New York City, for Merisant Co.

Jeremy Adam Koss, Rothstein Rosenfeld & Pancier, Hollywood, FL, Carlos Ramiro Caso, Miami, FL, for Fausto J. Campuzano.

Jeremy Adam Koss, Rothstein Rosenfeld & Pancier, Hollywood, FL, for Maria Campuzano, F. Garcia Wholesale & Export, Inc.

Steven Fine, Fort Lauderdale, FL, for Mark Siegel, Kathleen M. Siegel, Trio Intern. Trading, Inc.

Michael B. Chesal, Kluger Peretz Kaplan & Berlin, Miami, FL, Ricardo Alberto Reyes, Tobin & Reyes, Boca Raton, FL, for Countywide of Miami, Inc.

Steven Herbert Hibbe, Miami, FL, for Jose I. Arguelles, Sylvia B. Arguelles, Trapeza Overseas, Inc., Intrasit Services, Inc.

Francis Xavier Santana, Miami, FL, for Carlos Casanova.

Carlos Ramiro Caso, Miami, FL, for Alvaro Buendia.

C. Vincent LoCurto, Fort Lauderdale, FL, for Sun Container, Inc.

### ORDER GRANTING SUMMARY JUDGMENT AGAINST DEFENDANT ALVARO BUENDIA

JORDAN, District Judge.

Merisant, as successor in interest to the Monsanto Company and The Nutrasweet Company, seeks a permanent injunction restraining the defendants' sale and distribution of Equal tabletop sweetener, as well as monetary relief for alleged trademark and copyright infringement, false designation of origin, false description and dilution, and Florida law claims of alleged unjust enrichment, unfair competition, injury to business reputation, dilution of the distinctive quality of its trademarks, and participation in unconscionable, unfair, and deceptive acts or practices. Merisant

moves for summary judgment against defendant Alvaro Buendia on liability and damages under all counts and seeks the entry of a judgment in the amount of $1,148,392.70, plus statutory damages in the amount of $150,000, together with attorneys' fees. It also requests the entry of a permanent injunction enjoining Mr. Buendia from infringing Merisant's trademarks, trade dress, and copyrights. Federal jurisdiction exists pursuant to 15 U.S.C. § 1121(a), 17 U.S.C. § 101 et seq. and 28 U.S.C. §§ 1331, 1338 and 1367. Mr. Buendia has failed to respond to the motion. For the reasons which follow, Merisant's motion [D.E. 224] is GRANTED in part and DENIED in part as to liability. Appropriate relief will be determined following a separate evidentiary hearing.

## I. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Hilburn v. Murata Elecs. North Am., Inc., 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to Mr. Buendia, there is evidence on which the trier of fact could reasonably find a verdict in his favor. See Liberty Lobby, 477 U.S. at 251, 106 S.Ct. 2505; Hilburn, 181 F.3d at 1225; Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997)

## II. Undisputed Relevant Facts[1]

Monsanto is a manufacturer and distributor of consumer products sold under various registered trademarks owned by its wholly owned subsidiary, The NutraSweet Company. These products include the Equal brand of tabletop sweetener, which is a well-known and widely sold sweetener. Monsanto's successor, Merisant, has been substituted as the plaintiff in place of Monsanto and NutraSweet by my order of January 16, 2001 [D.E. 223].

Merisant owns the following trademarks for "Equal":

Registration No. 1,158,683, registered on June 30, 1981

Registration No. 1,318,800, registered on February 12, 1985

Registration No. 2,012,219, registered on October 29, 1996

Merisant, through Nutrasweet, also owns the following trademarks for "Nutrasweet":

Registration No. 1,262,746, registered on January 3, 1984

Registration No. 1,358,678 registered on September 10, 1985

Registration No. 1,336,188 registered on May 21, 1985

---

1. Under Local Rule 7.5, all material facts set forth in the statement served by the moving party are deemed admitted unless controverted by the opposing party's statement. Unless otherwise noted, these facts include those set forth in Merisant's statement of material facts, which are undisputed for purposes of this summary judgment motion to the extent that they have not been controverted by Mr. Buendia. Some facts not discussed here are analyzed in the discussion of Merisant's claims.

Merisant, through Nutrasweet, also owns the "NutraSweet Symbols":

Registration No. 1,325,241, registered March 19, 1985

Registration No. 1,366,139, registered on October 22, 1985.

Substantial resources have been devoted to the advertising and promotion of Equal, with more than $150,000,000.00 being spent in advertising and promoting Equal since 1992. As a result, the Equal product, bearing the NutraSweet trademarks and trade dress, is well known to the purchasing public throughout the United States. Sweeteners bearing the Equal and NutraSweet trademarks and the Equal trade dress have been and are now recognized by the public and in the food industry as originating from a single source. Net sales of Equal since 1992 have been in excess of $1,000,000,000.00, and the Equal and NutraSweet trademarks, the Equal trade dress, and the goodwill associated with them, are of inestimable value to Monsanto, NutraSweet, and Merisant. Monsanto and NutraSweet have engaged in and Merisant continues to engage in, interstate activities designed to promote the Equal product and the business and goodwill associated with their trademarks and to expand the use and reputation of their trademarks, trade dress, logos and property in Florida and throughout the United States.

The packaging Monsanto uses for the Equal product it sells to the retail market varies from the packaging it uses for the food service/institutional market. The bulk quantity cartons used for the institutional market contain either 1000 or 2000 packets, while the retail boxes contain 50, 100, 200, 500, or 700 packets. The food service packaging also expressly states "not for retail sale" and each individual packet is marked "We Proudly Serve" on the front of the packet, and "FOR RES-TAURANT USE" on the back of the packet.

The Equal retail boxes are marked with a strawberry design made up of photographs, text and graphics. The design is wholly original material that is copyrightable subject matter under the United States copyright laws. The certificates of registration Monsanto obtained from the Register of Copyrights for its strawberry design are dated April 13, 1999. The Equal retail boxes at issue may also contain other wholly original copyrightable material—specifically, a coffee cup design made up of photographs, text, and graphics. Monsanto also obtained certificates of registration for the coffee cup design, dated March 29, 1999. Both the coffee cup design and the strawberry design, therefore, are protected designs, for which Monsanto (now Merisant) owns the right, title and interest, as well as the copyright.

As a result of quality assurance audits in the fall of 1998, Monsanto learned that Equal food service packets were being sold in counterfeit retail packaging. Without Monsanto's authorization, individual packets of Equal sweetener that were originally sold in bulk food service cartons for institutional use only were re-packaged in counterfeit blue retail boxes imprinted with the protected designs.

The counterfeit Equal boxes expressly misrepresent that the product is distributed by the NutraSweet Company and that the boxes were printed in the United States of America. The counterfeit Equal product can be identified as follows:

- The colors of the counterfeit retail boxes are washed out, while the genuine retail boxes have crisp colors.

- The counterfeit blue retail packaging contains Equal packets bearing the words "We proudly serve" on the front of the packet and "FOR RESTAU-

·RANT USE" on the back of the packets. These phrases are not on the packets contained in genuine retail boxes.

- There are coupons printed on the inside of the genuine 50, 100 (and 200) count retail boxes bearing the strawberry design. There are no coupons on the inside of the counterfeit retail boxes.

- The corrugated shipping cartons used to ship the counterfeit retail boxes can also be distinguished from the shipping cartons used for the genuine product. A circular seal with the name of the manufacturer of the shipping carton, either "Wabash" or "International Paper," is present on a genuine shipping carton, whereas on a counterfeit carton, either there is no seal, or if there is a seal, it does not contain the name of the manufacturer.

In 1996, Mr. Buendia was a distributor, through his company Idexcol, Ltda., for Polaroid products in Columbia.[2] *See* Buendia Deposition at 26 [D.E. 217]. Idexcol also traded in food products from time to time. *See id.* at 38. At his deposition on December 13, 2000, Mr. Buendia admitted that he coordinated his efforts to create counterfeit retail blue boxes/cartons in Columbia with defendant Mark Siegel. Mr. Buendia testified that he procured the printer in Colombia to print the counterfeit Equal retail cartons, and then advised Mr. Siegel to open a letter of credit at a Colombian bank in order to pay the printer.[3]

Mr. Buendia then helped to locate a company in Colombia to break down the institutional cartons and repackage the Equal packets into the counterfeit retail boxes. He also helped provide for payment to that company. Mr. Buendia testified that he went to the warehouse owned by the defendant Trapeza/Intransit almost every day where the repackaging was being performed during an approximately eight-month period between May and December.

The owner of Trapeza Intransit, Jose Arguelles, was retained to tear down the food service cartons of Equal product and repack it into the smaller cartons and then repack the smaller retail cartons into the shipping boxes. Upon completion of the repackaging by Trapeza, Trio sold the product to, among others, Victory Wholesale Grocers, Purity Wholesale Grocers, Quality King Distributors, and Comimsa.

Mr. Buendia directly participated in selling some of the repackaged Equal to Quality King. For example, Mr. Buendia testified that he telephoned Quality King, a company he had previously done business with, in order to ascertain if it was interested in purchasing the Equal product. Mr. Buendia further testified that he understood from Mr. Siegel that repackaging institutionally packaged Equal into retail packages was good business, and that he could make money at it. He testified that his deal with Mr. Siegel was to receive a percentage of the profits, and that the various payments from Trio were the main source of his income in 1998. Trio made payments to Mr. Buendia with checks payable to Mr. Buendia, with wire transfers to Mr. Buendia, with checks payable to cash and negotiated by Mr. Buendia, with direct

---

**2.** Mr. Buendia testified at his deposition that he owned 40% of Idexcol in 2001. *See* Deposition of Alvaro Buendia at 32 [D.E. 217]. Prior to that he owned a "little less" than a 50% share in Idexcol through ownership in the Dis Pacifico corporation, one of the owners of Idexcol. *See id.*

**3.** Mr. Siegel is the President of defendant Trio International Trading, Inc., and owns 50% of the shares in that corporation. His wife owns the other 50% of the shares. *See* Mark Siegel Deposition at 11 [D.E. 168].

payments of cash to Mr. Buendia, and through wire transfers to Idexcol, Ltda.

## III. DISCUSSION

### A. TRADEMARK INFRINGEMENT

■ Merisant argues that Mr. Buendia's participation in the unauthorized counterfeiting and distribution of the Equal product infringes its trademarks, causing substantial and irreparable damage by misleading and confusing consumers as to the origin and source of the product, and diluting the trademark's distinctive quality. Merisant further argues that the distribution and sale of the Equal product in counterfeit packaging will cause damage to the invaluable reputation and goodwill that has been established for the NutraSweet and Equal trademarks. Additionally, Merisant claims that it will be unable to comply with its legal obligations[4] regarding the packaging, repackaging, sealing and resealing of food products.

As there has been no response from Mr. Buendia to the plaintiffs' motion for summary judgment, there are no disputed issues of material fact, making summary judgment appropriate in this case. Specifically, it is undisputed that Mr. Buendia participated in the manufacture and distribution of the counterfeit Equal and Nutra-Sweet product. Merisant argues that this conduct constitutes a violation of 15 U.S.C. § 1114(1)(a).

A defendant is liable for infringement of a federally-registered trademark under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) if, without the trademark owner's consent, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which is likely to "cause confusion, or to cause mistake or to deceive." *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir.1983). Merisant, therefore, must show (1) that its mark had priority; and (2) that Mr. Buendia's use of the mark is likely to cause consumer confusion. *See* 15 U.S.C. § 1114(1); *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir.1997) (citing *Dieter v. B & H Indus. of Southwest Fla., Inc.*, 880 F.2d 322, 326 (11th Cir.1989)). It is undisputed that Merisant's mark had priority—indeed, it is undisputed that Merisant, as successor to Monsanto, owns the registered trademarks for Equal and NutraSweet and never authorized their duplication. As to the second prong, I presume that the counterfeit items caused public confusion in the marketplace, as the counterfeit marks and the genuine marks are substantially identical both in design and use and it is undisputed that the counterfeit marks were sold to the public. *See id.* (citing *Polo Fashions v. Craftex, Inc.* 816 F.2d 145, 148 (4th Cir.1987) (a presumption of public confusion arises when counterfeit symbols are substantially identical to genuine symbols and are used in the same manner as the genuine symbols are used)).[5] Moreover, Mr. Buendia has never

---

4. The legal obligations cited by Merisant include 21 C.F.R. Part 110 (including specifically, sub-parts A, B, C, E, and G, entitled "Current Good Manufacturing Practice in Manufacturing, Packing or Holding Human Food"); 21 C.F.R. Part 7, sub-part C, § 7.40 et seq. entitled "Recalls (Including Product Corrections)—Guidelines on Policy, Procedures, and Industry Responsibilities"; §§ 701 and 704 of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 371 and 374; and

§ 361 of the Public Health Service Act 42 U.S.C. § 264. *See* Plaintiffs' Motion for Summary Judgment Against Alvaro Buendia at 14 [D.E. 224].

5. The Eleventh Circuit (and the former Fifth Circuit) have identified various factors to be considered in determining whether a likelihood of confusion exists between two trademarks. These include "the type of trademark, the similarity of design, the similarity of the

opposed Merisant's statement of undisputed facts, or for that matter, responded to the summary judgment motion at all, so there is nothing to rebut this presumption. There are no genuine issues of material facts in dispute, and Merisant has established each element of its claim for trademark infringement. Trademark infringement is a tort, and any member of the distribution chain is liable as a joint tortfeasor. *See Dive N' Surf, Inc. v. Anselowitz,* 834 F.Supp. 379, 382 (M.D.Fla.1993) (citations omitted). Accordingly, summary judgment against Mr. Buendia as to Count I is granted.

### B. Violations of 15 U.S.C. § 1125—False Designation of Origin False Description, and Dilution

In pertinent part, 15 U.S.C. § 1125(a)(1), which Merisant alleges was violated in Counts II and III, provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of

such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.*

 The Eleventh Circuit has held that a defendant is liable for a violation of 15 U.S.C. § 1125 if the plaintiff can show that (1) its mark is inherently distinctive or has acquired secondary meaning, (2) its mark is primarily non-functional, and (3) the defendant's mark is confusingly similar. *See AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir.1986). If there is a connection in the consumer's mind between the mark and the product's producer—that is, there is a "secondary meaning," whether that producer is known or unknown—protectability is established notwithstanding the indistinctiveness of the trade dress. *See id.* at 1536.

---

product, the identity of retail outlets and purchasers, the similarity of advertising media used, the defendants' intent, and actual confusion." *See John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir. 1983) (quoting *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d 500, 504 (5th Cir. 1980)). An analysis of these factors is unnecessary, given that Mr. Buendia, previously though represented by counsel, has never responded to Merisant's motion for summary judgment or opposed its statement of undisputed material facts, thereby failing to rebut any presumption of confusion based on the substantially identical nature of the designs and use. I note, however, that even a cursory

examination of these factors leads to the inescapable conclusion that there is a likelihood of confusion, or a likelihood of causing mistake or deception, particularly in light of the former Fifth Circuit's holding that if "a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" *See John H. Harland Co.,* 711 F.2d at 976 (quoting *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d at 506). It is irrefutably clear from this record that in repackaging the Equal product, Mr. Buendia did, in fact, intend to derive "benefit from the reputation of the plaintiff."

First, Merisant has established that its mark has acquired secondary meaning, for it is undisputed that Equal and NutraSweet have devoted substantial resources to the advertising and promotion of Equal, and that as a consequence, the NutraSweet trademarks and trade dress are well known to the purchasing public throughout the United States. Also undisputed is the fact that sweeteners bearing the Equal and NutraSweet trademarks and the Equal trade dress have been and are now recognized by the public and in the food industry as originating from a single source. *See Remcraft Lighting Products, Inc. v. Maxim Lighting, Inc.,* 706 F.Supp. 855, 858 (S.D.Fla.1989) (citing *Isaly Company v. Kraft, Inc.,* 619 F.Supp. 983, 990 (M.D.Fla.1985) (holding that the trier of fact must consider the length of time and manner of use of trade dress, the nature and extent of its use, and efforts made in order to promote a conscious connection in the public's mind between the mark and the particular source of origin)). *See also Brooks Shoe Manufacturing Company, Inc. v. Suave Shoe Corp.,* 716 F.2d 854, 860 (11th Cir.1983) (evidence of intentional copying is also probative of secondary meaning). I therefore conclude that Merisant has established the first element of its § 1125 claim.

Second, "a mark is 'functional' if it affords benefits in the manufacturing, marketing, or use of the goods or services with which [it] is used, apart from any benefits attributable to the mark's significance as an indication of source, that are important to effective competition by others and that are not practically available through the use of alternative designs." *University of Florida v. KPB, Inc.,* 89 F.3d 773, 777 n. 6 (11th Cir.1996) (citing Restatement (Third) of Unfair Competition § 17 (1994)). When applying the functionally test, the product is viewed as a whole and not as to any one specific part, *see Remcraft Lighting Products, Inc.,* 706 F.Supp. at 857 (S.D.Fla. 1989), so even if individual elements of a product's packaging are functional, the package as a whole can still be afforded protection. *See AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1538 (11th Cir.1986). I find that the second element is satisfied here because, though the Equal box itself may be functional, there is nothing functional about the strawberry or coffee cup designs on the Equal boxes, the fact that the boxes are blue, or the combination of graphics and words used to create the Equal and NutraSweet trade dress. The number of alternative designs practically available to Monsanto were undoubtedly infinite.

The central inquiry in the claims alleged in Counts II and III and arising under 15 U.S.C. § 1125 is "whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers." *See Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.,* 656 F.2d 186, 191 (5th Cir.1981) (quoting *Boston Professional Hockey Association v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1010 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975)). "The touchstone under § 1125 is not similarity of the registered mark but similarity in the overall trade dress of the products." *See id.* (citations omitted). *See also Original Appalachian Artworks, Inc. v. Toy Loft, Inc.,* 684 F.2d 821, 831–32 (11th Cir.1982) (holding that the likelihood of confusion resulting from the defendant's adoption of a trade dress similar to the plaintiff's the touchstone test for a violation of § 1125). Trade dress involves the "total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *See University of Florida v.*

*KPB, Inc.*, 89 F.3d 773, 776 n. 4 (11th Cir.1996) (citations omitted). The factors to be examined in analyzing such a claim are essentially the same as the factors considered for determination of trademark infringement, "but the scope of inquiry into similarity of design is considerably broader." *See Sun–Fun Products, Inc.*, 656 F.2d at 191. *See also John H. Harland Co.*, 711 F.2d at 981. ("The factors relevant to determining whether there is a likelihood of confusion between the trade dress of the two products, are 'essentially the same' as those relevant to determining whether there is a likelihood of confusion between the parties' trademarks.").

■ The undisputed facts characterize the overall trade dress of the counterfeit Equal product packaging to be nearly identical to the genuine Equal product. The boxes are labeled with the trademarked Equal and NutraSweet names. The colors of the counterfeit retail boxes are washed out, while the genuine retail boxes have crisp colors, but they are both blue. The protected designs were reproduced on the counterfeit boxes. Furthermore, the counterfeit boxes expressly misrepresent that the product is distributed by the NutraSweet Company and that the boxes were printed in the United States of America. Other than some printed coupons which are printed on the inside of the genuine retail boxes, but not present on the counterfeit retail boxes, and the phrases "for restaurant use" and "we proudly serve" appearing on the packets in the counterfeit retail boxes but not in the genuine retail boxes, the genuine and counterfeit boxes are substantially similar if not identical, making confusion, mistake, or deception of the public likely as to the affiliation, connection or association with the manufacturers of the Equal product and the product's origin. Accordingly, sum-

mary judgment against Mr. Buendia on Counts II and III is granted.

## C. THE COPYRIGHT INFRINGEMENT CLAIM IN COUNT IV

■ To prevail on its copyright infringement claim, Merisant must prove (1) ownership of a valid copyright in the work allegedly infringed and (2) that Mr. Buendia copied the protected work. *See Donald Frederick Evans and Associates, Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 903 (11th Cir.1986). The first prong is satisfied in that the registration certificates obtained by Monsanto for the strawberry and coffee cup designs constitute *prima facie* evidence of valid copyright ownership of each design. 17 U.S.C. § 410(c). *See Dive N' Surf, Inc.*, 834 F.Supp. at 382. In order to satisfy the second prong, Merisant must show that Mr. Buendia participated in the copyright infringement, but it does not have to prove that Mr. Buendia personally duplicated the designs. *See Dive N' Surf, Inc.*, 834 F.Supp. at 382 (citing *Screen Gems–Columbia Music, Inc. v. Metlis and Lebow Corp.*, 453 F.2d 552, 554 (2d Cir.1972) ("copyright infringement is in the nature of a tort, for which all who participate in the infringement are jointly and severally liable")).

■ Mr. Buendia testified that he procured the printer in Colombia to print the counterfeit Equal retail boxes, and advised Mr. Siegel on opening a letter of credit in order to pay for the printing. He further testified that he helped to locate a company to break down the institutional cartons and repackage the Equal packets into the counterfeit retail boxes. Accordingly, there are no disputed issues of material fact concerning Mr. Buendia's participation in the infringing of Merisant's copyright, and both elements of Merisant's copyright infringement claim have been established.

Thus, summary judgment is appropriate against Mr. Buendia on the copyright infringement claim in Count IV.

### D. Unjust Enrichment Claim—Count VI

■ It is unclear from Merisant's complaint whether its claim for unjust enrichment is under federal or state law. Under federal law, "a deliberate or willful trademark infringer can be required to turn over the profits he earns during the period of infringement subject to the discretion of the district judge and in light of the equities of the case." 15 U.S.C. § 1117. *See American Farm Bureau Federation v. Alabama Farmers Federation,* 935 F.Supp. 1533, 1551 (M.D.Ala.1996) (citing *Maltina Corp. v. Cawy Bottling Co., Inc.,* 613 F.2d 582, (5th Cir.1980)). Under the Lanham Act, "willfulness" does not require a finding that the defendant intended to steal the plaintiffs' trademark, or produce a counterfeit product, but only that the infringement was not accidental, or was done knowingly and with disregard of the rights of the mark holder. *See Ambrit Inc. v. Kraft Inc.,* 6 U.S.P.Q.2d 1235, 1236, 1988 WL 281566 (M.D.Fla.1988) (citations omitted).

■ Mr. Buendia testified at his deposition that when Mr. Siegel told him that a lawyer had previously told Mr. Siegel that repackaging product was completely legal, Mr. Buendia had felt reassured, and it was only then that he went to find people to repackage the Equal product. *See* Buendia Deposition at 184 [D.E. 217]. But in order for the infringer to be required to account for profits, he must only be shown to have acted deliberately or purposefully, for "[w]hether he believed himself to be within the law if not, he was knowingly and deliberately cashing in upon the good will of [the registrant.]" *Burger King Corp. v. Mason,* 855 F.2d 779, 781 (11th Cir.1988). Other circuits have similarly

rejected a so-called good faith defense in which a defendant contends that he consulted an attorney who advised him that he was not infringing, and therefore should not be held accountable for profits. *See id.* (citing *Wolfe v. National Lead Co.,* 272 F.2d 867 (9th Cir.1959), *cert. denied,* 362 U.S. 950, 80 S.Ct. 860, 4 L.Ed.2d 868 (1960), *overrun in part on other grounds, Maier Brewing Co. v. Fleischmann Distilling Corp.,* 359 F.2d 156, 165 (9th Cir. 1966) and noting *Wolfe* was cited with approval by the Eleventh Circuit in *John H. Harland Co.,* 711 F.2d at 978). Here, someone else actually consulted an attorney, but even if Mr. Buendia had done so, this would not change the fact that the infringement he was involved with was not accidental.

■ The law in the Eleventh Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under 15 U.S.C. § 1117. *See Burger King Corp.,* 855 F.2d at 780. The accounting for profits furthers the Congressional purpose by making infringement unprofitable, and because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future it is justified. *See id.* (citing *Maltina Corp. v. Cawy Bottling Co., Inc.* 613 F.2d 582, 585 (5th Cir. 1980)).

Thus, given this analysis of the trademark infringement claims, I conclude that Merisant has made the requisite showing for a claim of unjust enrichment under the Lanham Act. Accordingly, there is no reason to analyze whether Merisant has a state claim for unjust enrichment.

### E. Florida Law Claims

#### 1. Count V—Unfair Competition Under Florida Common Law

■ "The Florida Trademark Act ... explicitly preserves common law rights in marks acquired in good faith." *Tally–Ho,*

*Inc. v. Coast Community College Dist.*, 889 F.2d 1018, 1023 (11th Cir.) (citations omitted). The legal standard for federal trademark and unfair competition, and for common law trademark infringement, are essentially the same. *See id.* at 1025–26, n. 14. To prevail on its unfair competition claims under Florida common law, Merisant must show " 'deceptive or fraudulent conduct of a competitor and likelihood of consumer confusion.' " *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493–94 (11th Cir.1990) (quoting *Evans*, 785 F.2d at 914). In light of my analysis of Merisant federal claims, I conclude that Merisant has established the elements necessary to its common law unfair compensation claim. In other words, because it is undisputed that Merisant did not authorize the reproduction of its trademark and trade dress and because I have already found that there is a likelihood of consumer confusion, summary judgment is appropriate on the Florida common law claim of unfair competition in Count V.

### 2. COUNT VII—INJURY TO BUSINESS REPUTATION AND DILUTION OF TRADEMARK UNDER FLORIDA LAW

Count VII alleges that the defendants have caused injury to Merisant's business reputation and/or alternatively, caused dilution of the distinctive quality of Merisant's trademarks in violation Fla. Stat. § 495.151, Florida's anti-dilution statute. That statute allows a court to enjoin subsequent use of the same or similar trademark if the plaintiff proves:

> that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark ... notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

Fla.Stat. § 495.151

Under Florida's statute, neither confusion nor competition are necessary. *See*

*Harley–Davidson Motor Company v. Iron Eagle of Central Florida Inc.*, 973 F.Supp. 1421, 1425 (M.D.Fla.1997). But while it may be obvious that the distribution of a counterfeit product could easily result in dilution of the distinctive quality of Merisant's trademark and threaten its integrity, Florida's antidilution statue is "not intended to apply to the use of a similar mark on similar goods." *id.* The Eleventh Circuit, in *Community Federal Savings and Loan Assoc. v. Orondorff*, 678 F.2d 1034 (11th Cir.1982), noting that the dilution doctrine was not incorporated into the Lanham Act, quoted the Fifth Circuit's description of dilution:

> Dilution is a concept most applicable where a subsequent user uses the trademark of a prior user for a product so dissimilar from the product of the prior user that there is no likelihood of confusion of the products or sources, but where the use of the trademark by the subsequent user will lessen the uniqueness of the prior user's mark with the possible future result that a strong mark may become a weak mark.

678 F.2d at 1037 (quoting *Holiday Inns, Inc. v. Holiday Out in America*, 481 F.2d 445, 450 (5th Cir.1973)). Accordingly, dilution "has no application when the question is whether the marks being used on goods of substantially the same descriptive properties are similar enough to cause confusion in the minds of consumer with respect to the source of the goods." *Community Federal Savings*, 678 F.2d at 1037 (quoting *Pro-Phy-Lac-Tic Brush Co. v. Jordan Marsh Co.*, 165 F.2d 549, 553 (1st Cir. 1948)). In this case, Merisant is not arguing that its mark is being used on a dissimilar product, but rather, that its mark is being copied on boxes containing its genuine product by unauthorized individuals,

thereby creating confusion on the minds of consumers. Thus, dilution is inapplicable and Merisant's motion for summary judgment to Count VII is DENIED.

### 3. COUNT VIII—UNFAIR TRADE PRACTICE UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

 In Count VIII, Merisant alleges that, in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.204. Mr. Buendia participated in unconscionable acts or practices and participated in unfair or deceptive acts and practices by knowingly manufacturing, selling, and distributing the counterfeit Equal product. A private right of action for damages under the Act, however, cannot be maintained unless the alleged unfair or deceptive acts or practices complained of involves a consumer transaction. See Bryant Heating and Air Conditioning Corp., Inc. v. Carrier Corporation, 597 F.Supp. 1045, 1053 (S.D.Fla.1984). In Bryant, the court noted that the Florida courts strictly construe the definition of consumer transaction in accord with the statute's definition as follows:

> a sale, lease, assignment, award by chance, or other disposition of an item of goods, a consumer service, or an intangible to an individual for purposes that are primarily personal, family, or household or that relate to a business opportunity that requires both his expenditure of money or property and his personal services on a continuing basis and in which he has not been previously engaged or a solicitation by a supplier with respect to any of these dispositions.

(Emphasis Added)

In other words, "a cause of action for civil damages under Chapter 501 is legally insufficient in the absence of a showing that the plaintiff has not previously been engaged in the business involved." Dar-

rell Swanson Consolidated Services v. Davis, 433 So.2d 651, 652 (Fla. 1st DCA 1983). This is presumably because the "statute appears to be directed to entities that have traditionally been thought of as consumers, in situations traditionally thought of as consumer transactions." Packaging Corporation International v. Travenol Laboratories, 566 F.Supp. 1480, 1481 (S.D.Fla.1983). Even assuming that Merisant could, in some cases, be considered a consumer, it can not fulfill the standing requirement under the Act that it not have engaged previously in the business involved. To the contrary, it is undisputed (and necessary to several of Merisant's other claims) that Merisant has and is engaged in the business involved, that is, the manufacture, sale and distribution of the Equal product. The injury alleged, therefore, can not be characterized as arising out of a consumer transaction. Thus, I conclude that Merisant lacks standing to pursue its claim under the Florida Deceptive and Unfair Trade Practices Act, and summary judgment is denied as to Count VIII. See M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1493 n. 21 (11th Cir.1990) ("The Florida DTPA applies to consumer transactions, defined in part as transactions in which the consumer 'has not been previously engaged.' "). See also Big Tomato v. Tasty Concepts, Inc. 972 F.Supp. 662, 663 (S.D.Fla.1997). But see Laboratorios Roldan v. Tex Intern., Inc., 902 F.Supp. 1555, 1570 (S.D.Fla.1995) (holding that "palming off" could constitute violation of Fla.Stat. § 501.201).

### IV. CONCLUSION

In sum, Merisant's motion for summary judgment against Mr. Buendia [D.E. 224] is GRANTED as to Counts I, II, III, IV, V, and VI, and DENIED as to Counts VII and VIII. A separate evidentiary hearing will be set for a determination of relief, including injunctive relief and damages. A

final judgment will issue by separate order at the appropriate time.

### ORDER MODIFYING SUMMARY JUDGMENT ORDER

The order granting in part summary judgment in favor of Merisant [D.E. 300] is hereby modified as follows:

Summary judgment in favor of Merisant is DENIED as to Count VIII, but summary judgment in favor of Alvaro Buendia is GRANTED on Count VIII, because—as I explained in that order—Merisant has no standing to bring a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.201.